CALEB C. MAGRUDER, ET AL.

*vs.*

STATE ROADS COMMISSION.

*State Roads Commissioners: authority and discretion.   Juris-
diction of courts.*

The courts have the right to prevent the State Roads Com-
mission from diverting' funds appropriated by the Legislature
for the building and improvement of one road, or set of roads,
to the construction of another or others.                    p. 532

But to justify a Court in interfering with the powers and
the large discretion vested in the commission, it should be very
clearly shown that it was improperly using the funds.    p. 533

In appropriating the funds among the different roads in dis-
tricts of a county, for every difference of opinion their judg-
ment should not be reviewed by the courts.            pp. 534-535

*Decided May 7th, 1915.*

Appeal from the Circuit Court for Anne Arundel County.
(In Equity.)   (BRASHEARS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE,
THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE,
JJ.

*S. S. Field,* for the appellants.

*Leon E. Greenbaum,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellants, some of whom are taxpayers of Prince George's County and others of Anne Arundel County, filed a bill for in injunction against the members of the State Roads Commission, (*a*) to restrain them from expending any portion of the Road Loans Fund provided for by Chapter 267 of the Acts of 1914, allowed to Prince George's County, upon the road from Meadows to Camp Springs, or upon any other road not a part of a main gap of the State Roads system selected by the State Roads Commission in 1909, etc.; and (*b*) praying that a mandatory injunction may also be issued at once compelling the defendants to apply the amount of $74,536, the balance claimed to be in hand for road construction in Prince George's County, only upon what is called the "Old Stage Road." After an answer was filed and testimony taken, the Court below passed a decree dismissing the bill, and from that decree this appeal was taken.

Chapter 141 of the Acts of 1908, which created the State Roads Commission, provided for "the establishment of a system of public roads and highways, in Maryland." It directed in section 32H (now sec. 40 of Art. 91 of the Code of 1912) that "The general system of public roads hereinbefore provided for in this Act shall be completed as soon as may be feasible by the said Commission, the time for the completion thereof, not to exceed, however, seven years from 1st day of July, 1908; and the aggregate and total expenditures of the said Commission for said purposes shall not exceed the sum of five million dollars ($5,000,000), of which sum not more than one million dollars ($1,000,000) shall be expendid in any one year, accounting from said 1st day of July, 1908." It is manifest that when that Act was passed the stupendous undertaking in which the State was engaging was not fully realized, as at each session since then the Legislature has been called upon to pass laws on the subject and make additional appropriations. State Road Loans have been authorized since 1908 as follows: $1,000,000 in 1910, $3,170,000 in 1912 and $6,600,000 in 1914, or

$10,770,000 since the original Act, in addition to smaller
sums appropriated for the State Road purposes. In con-
sidering the Act of 1908 we must therefore remember that
it was then providing for a system, the cost of which was
not to exceed $5,000,000, while now there has been spent and
authorized over three times that amount, and there is not
yet sufficient to complete the system as originally contem-
plated and shown by the maps filed under the provisions of
section 32B of the original Act, which is as follows: "The
said Commission, in addition to the powers hereinbefore
mentioned, shall have full power and be charged with the
full duties to select, construct, improve and maintain such a
general system of improved State roads and highways as
can reasonably be expected to be completed with the funds
herein provided in and through all the counties of this
State. The said Commission shall reach its conclusions as
to the selection of the roads to be improved on or before
May 1, 1909, and shall on or before that date file with the
County Commissioners of each county for public inspection
a certified copy of a map of the State showing plainly thereon
the adopted system of main roads to be improved under this
Act, which map shall bear the written approval of the said
Commission."

If it was supposed that the "general system of improved
State roads and highways" could thus "reasonably be expected
to be completed with the funds" therein provided "in and
through all the counties of this State," those making the
estimate fell far short of what it would require. Certain it is
that all of the roads selected in Prince George's County, for
example, could not have been built with improved material
with the amount appropriated before May 1st, 1909, when
the map was required to be filed, and had not the State
Roads Commission had very great discretion vested in it
the construction would probably not have been commenced
without further legislation. That Commission had to deter-
mine which of the various roads they had selected for im-
provement should be improved, and it could not then have

been contended that the Court could require the Commission to improve the "Old Stage Road" first, or second, or in any particular order. There is nothing in the selection of the five roads selected, and hereinafter mentioned, designating the order in which they should respectively be improved.

But it is contended on behalf of the appellants that Chapter 267 of the Acts of 1914, which appropriated $5,000,000 to the counties and $1,600,000 to building a bridge over the Patapsco River from Baltimore City to Brooklyn, and the balance, if any, to the streets of Baltimore City, contains a provision which does require the money to be applied to the "Old Stage Road" in preference to the two contemplated by the Commission which are now objected to. The said sum of five million dollars was by section 8 of Act of 1914 appropriated to the several counties by regular appropriation on county road mileage basis (as the original Act did) and by special appropriations. By it Prince George's was entitled to $108,800 on the mileage basis and $116,200 as special appropriation, making $225,000 in all. Following the various appropriations to the counties is this provision: "That the five million dollars ($5,000,000) provided for the counties shall be expended in paying for the work already done in counties in excess of previous allotments, in finishing the work now under construction and not completed, and shall then be applied, first, to filling in the main gaps of the system, and that the balance remaining thereafter shall be applied to secondary gaps for necessary bridges, for rights of way, for over-head expenses, for the construction and maintenance of the Washington Boulevard ($50,000), and for other miscellaneous purposes."

About $57,000 of the $225,000 was used in paying for work which had been done in that county prior to the Act of 1914, in excess of previous allotments, so that only about $168,000 was available at the beginning of the operations in 1914. Five routes were determined upon prior to May 1st, 1909, in accordance with the Act of 1908. The following resolution was adopted by the Commission on October 5th,

1908: "Final location of roads in Prince George's County. Dr. Remsen moved that the road to be selected as a State Road in Prince George's County shall start from the Charles County line, near Mattawoman by way of T. B., Clinton, Camp Springs, Silver Hill to the District Line; from the District Line by way of the Washington-Marlboro Pike to Oakland, Forestville, Meadows to Marlboro; from the District Line over the Central Avenue road to Seat Pleasant to Hall Station to the Patuxent River near Hardesty, by the most direct route; from Bladensburg on the Washington Boulevard by the way of Buena Vista, Collington to Priest's Bridge, and from a point near Camp Springs, on the road from Charles County to the District Line, to Meadows, on the Washington and Marlboro Turnpike, or as much thereof as the funds will permit. The motion was seconded by Governor Crothers, and adopted." In the answer, those roads are named, and as the evidence refers to them as there numbered it will be convenient to quote from the answer:

"(a) A road running from Bladensburg to Priest's Bridge and known as the 'Old Stage Road,' being of about fourteen miles in length. (b) A highway known as the Central Avenue Road, running from the District Line via Seat Pleasant Hall to Hardesty, being of about fourteen miles in length. (c) A highway running from the District of Columbia via Oakland, Meadows, Marlboro to Hill's Bridge, being of about sixteen miles in length. (d) A highway running from the District of Columbia line via Silver Hill, Camp Springs, Clinton, T. B., to the Charles County line, being of about sixteen miles in length. (e) A highway running from Camp Springs to Meadows, there connecting with the highway referred to as (c) herein, being of about three miles in length."

Of the $168,000 available at the beginning of the operations in the year 1914, about $9,400.00 was used on road (d) from T. B. to Mattawoman, about $18,000 on road (b) from the District Line to Seat Pleasant, about $38,700 on road (b) from Seat Pleasant to Largo, and about $36,800 for resurfacing on route (d) from the District Line to Camp Springs,

and apparently several thousand dollars in addition were spent, but not explained in the testimony, which shows a balance of about $63,000 to be used on the roads in that county which were still unfinished when this bill was filed. As the estimate is that it would cost about $154,000 to build the Old Stage Road, it is evident that that can not be built out of the balance in hand, and if the $63,000 were spent on it there would be a gap of six or eight miles left on it in Prince George's County, in addition to what there would be beyond the Anne Arundel line. Then on what is called the Central Avenue Road, which runs from the District Line to the State Road near Annapolis, which is conceded to be one of the main lines laid out by the Commission, only 2.23 miles have been completed and 2.59 are under contract, making 4.82 miles in all. That will leave nine miles of that road in Prince George's County unprovided for. As according to the estimate it would cost nearly $100,000 to complete it, that could not be finished with the balance in hand. There is nothing whatever in the original statute or any of the subsequent ones which indicates any intention to give the Old Stage Road a preference over all of the other four selected in 1909. It is true that in the resolution of October 5, 1908, in speaking of the one from Camp Springs to Meadows, it said "or as much thereof as the funds will permit," but even if it be conceded that that could be a limitation on the Commission, or would give the Old Stage Road a preference over the one from Camp Springs to Meadows, that would not be a reason for giving it a preference over the Central Avenue Road (b) and, as we have seen, nine miles of that is yet to be built. It would seem to be much more business-like and desirable to use the balance in hand in completing the Central Avenue Road than to expend it on the Old Stage Road. So without now referring to other matters, it is unnecessary to discuss further the branch of the case by which it was sought to obtain a mandatory injunction to compel the defendants to apply the balance (erroneously stated to be $74,536) only upon said Old Stage Road. There is no foun-

dation for such demand, and if the Commission had granted it, it would simply have resulted in making a gap in a road which had not been commenced when the Act of 1914 was passed, or when the bill was filed.

The Commission intends to use the balance in hand to build a road from Camp Springs to Meadows and one from Marlboro to Hill's Bridge. No specific reference is made in the bill to the latter, and the only way by which it could be said to be included in the bill is the effort to have all the balance expended on the Old Stage Road, and the general clause in the prayer—"or upon any other road not a part of a main gap of the State Road System selected" in 1909— the appellants contending that it is not a main gap. There can be no doubt from the record that one of the roads selected by the Commission before May 1, 1909, was the one marked (c) above. It is true that originally it seems to have been intended, by the meeting of October 28, 1908, to stop that road at Marlboro, but on April 29, 1909, it was on motion of Mr. Shoemaker, seconded by Dr. Remsen, extended from Marlboro to Hill's Bridge, and that entire road was one of the five selected for Prince George's County and put on the map adopted on May 1, 1909. That would give a completed road from the District Line to the Anne Arundel line and only two and a half miles are required to complete it.

The other gap objected to is from Camp Springs to the Meadows. That is about three miles long. Neither that nor the one just mentioned above has yet been constructed, but the Commission proposes to do so, if not prevented by this proceeding. It is estimated that the road from Marlboro to Hill's Bridge will cost about $25,000 and from Camp Springs to Meadows about $36,000—the two absorbing most of the balance in hand. One of the five roads adopted October 5, 1908, for this county was "from a point near Camp Springs on the road from Charles County to the District Line to Meadows, on the Washington and Marlboro Turnpike, or as much thereof as the funds will permit." By the construction of those three miles from Camp Springs to

Meadows, there will be a State Road from La Plata, the county seat of Charles County, through Upper · Marlboro, the county seat of Prince George's County, to Annapolis, the capital of the state and county seat of Anne Arundel County. The same can be said from Leonardtown, the county seat of St. Mary's County, as the State Road running through Leonardtown joins the one from La Plata to the District Line before the latter reaches Camp Springs. Then there will be a State Road from Prince Frederick, the county seat of Calvert County, via Upper Marlboro to the District Line ,or anyone desiring to do so can go to Camp Springs and then down to La Plata. One of the projected roads in Southern Maryland, as shown by the maps with which we have been furnished, was from Solomon's Island, at the lower end of Calvert County, in a northerly direction through Calvert County, passing through Prince Frederick, thence into Anne Arundel County to Annapolis. Another from Point Lookout, the extreme southern end of St. Mary's, runs northerly through that county to Charles and through part of Charles until it intersects the road going through La Plata to the District Line. Another runs from Rock Point, the southern end of Charles County, northerly through Charles on to the District Line. There were three roads laid out to run easterly and westerly, as shown on the map—the one from Camp Springs through Upper Marlboro, the Central Avenue Road referred to above and the Old Stage Road. If the roads are properly laid down on the map the Central Avenue Road can not be much longer than the Old Stage Road, and is only a few miles distant from it.

We have stated the facts thus fully because they seem to us to shed much light on the question before us. We have no doubt about the right of the courts to prevent the State Roads Commission from diverting funds appropriated by the Legislature for the building and improvement of one road or set of roads to the construction of another or others, but to justify a Court in interfering with the powers and the

large discretion vested in that Commission, it would have to be very clearly shown that it was improperly using such funds. What we said in *Weller* v. *Mueller,* 120 Md. 633, on that subject, must suffice, without further discussion of it. The State Roads Commission necessarily had very delicate questions to solve in locating the roads. Sometimes those of one part of a county have felt aggrieved at the action of the Commission because they located a road differently from what they wanted, and in many, possibly most, instances, those complaining were perfectly honest in their contentions, and, perhaps naturally, thought that their part of the county was better than another part for the road in question. It required firmness, intelligence and tact to deal successfully with such controversies. Presumably, at least, and we may acknowledge it as a fact, those engaged in that character of work are better qualified to determine the localities of roads and the material out of which they are to be made, than courts are, and when the members of the Commission have settled the difficult problems they often have before them, the courts should be very cautious when they are asked to interfere with them. In 1908 and 1909, there were many new questions to be determined by the Commission, and one amongst the most difficult of settlement was the character of roadbeds to be made. When the first appropriation was made, 1908, very few, if any, of those interested in the good roads movement had any very definite idea of what the cost would be, or possibly that such expensive material as concrete would be used to any extent in building roads. So now we must look at the question somewhat differently from what we might have done then.

It is not a question of building new roads, as suggested by the appellants, for all of the roads before us were in contemplation, but the question is which of those shall be built with the money now in hand. It is not altogether clear, just what was intended by the expression "first, to filling in the main gaps of the system, and that the balance shall be

applied to secondary gaps, for necessary bridges, for rights of way * * * and for other miscellaneous purposes." Bridges might be required in filling in "main gaps." It 'might have been necessary to obtain and pay for rights of way before the main gap could be filled in, for it is not unusual to be necessary to acquire additional property after such work is begun, in order to improve the grade or make some change which is only found to be necessary after the work is started, and when no expenditure will be required for "miscellaneous purposes" the system may be regarded as practically perfect. So the legislature could not have meant that payment of all those things must in all cases be postponed to filling in what are called "main gaps."

It must be remembered that the legislation was for the road system of the whole State, and not simply for five roads in Prince George's County. In some localities there would be no difficulty in determining what would be meant by "main gaps" and "secondary gaps." For example, take the great highway running through the western part of the State. Those familiar with it know what a beautiful road-bed could be found at places on both sides of some miles of road which would spoil, or at least greatly detract from the pleasure of the trip. For some reason many of the State Roads seem to have been built in sections, the result being a few miles of splendid road, some miles of what would be almost a misnomer to call a road, and then perhaps another good one. Sometimes there will be what is known as a main road and what are merely side or branch roads. In such localities and under such conditions, anyone could see the distinction between main gaps and those on some local road, but in such case as we have before us, the members of the Commission who give their time to the work, would be better qualified to draw the line between those classes of gaps than judges or others would. If their judgment about such matters is liable to be reviewed by the courts every time there is a difference of opinion about them, much of the State's money will be frittered away and

the time of the Commission and their agents and employees largely occupied with litigation.

There is no evidence of such a gross error or failure of duty on the part of the Commission in this case as calls upon or authorizes the Court to interfere. On the contrary, there is much to be said in favor of the conclusion it reached. To use the balance on hand on the Old Stage Road would make a gap, rather than fill one, as no part of that road has been built. The Central Avenue Road is not far from it and runs practically parallel with it. But beyond that, the gaps which the Commission propose to fill are manifestly important ones, and will for reasons shown above be of great service to the people of Southern Maryland. The Commision properly takes into consideration the system of road it is building, and not merely a part of it in one county. The system can not be advantageously worked unless the connections, etc., by the roads in one county with those of other counties are kept in mind. Certain it is, in our judgment, that neither the road from Camp Springs to Meadows, which connects the roads in Southern Maryland running north and south, by joining the one numbered (*d*) with that numbered (*c*) above, or the road to Hill's Bridge, which completes that road through the county, is so clearly a secondary gap, and not a main gap of the system, within the meaning of the statute, as would justify the Court in interfering with the Commission. So without further discussion of it we will affirm the decree.

> *Decree affirmed, the appellants to pay the costs, above and below.*