MILTON J. RUARK, Engineer of Sewers, et al. *v.* INTERNATIONAL UNION OF OPERATING ENGINEERS, Local Union No. 37, et al.

[Nos. 43-48, April Term, 1929.]

*Decided June 25th, 1929.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Simon E. Sobeloff, Deputy City Solicitor,* with whom was *A. Walter Kraus, City Solicitor,* on the brief, for the Mayor and City Council of Baltimore, and its engineer, appellants.

*Burdette B. Webster* and *George Ross Veazey,* with whom were *Edwin W. Wells* and *Charles F. Harley* on the brief, for the contractor appellants.

*Isaac Lobe Straus,* for the appellees.

578

PARKE, J., delivered the opinion of the Court.

The General Assembly of Maryland passed a statute known as chapter 94 of the Acts of 1910, whose sections 2 and 3 constitute that portion of the Public Local Laws of the City of Baltimore which is as follows: "516. That eight hours shall constitute a day's work for all laborers, workmen or mechanics who may be employed by or on behalf of the Mayor and City Council of Baltimore except in cases of extraordinary emergency which may arise in time of war or in cases where it may be necessary to work more than eight hours per calendar day for the protection of property or human life; provided, that in all such cases the laborer, workman or mechanic so employed and working to exceed eight hours per calendar day shall be paid on the basis of eight hours constituting a day's work; provided further, that the rate of per diem wages paid to laborers, workmen or mechanics employed directly by the Mayor and City Council of Baltimore shall not be less than two dollars per diem; provided further, that not less than the current rate of per diem wages in the locality where the work is performed shall be paid to the laborers, workmen or mechanics employed by contractors or sub-contractors in the execution of any contract or contracts in any public work within the City of Baltimore.

"516A. That all contracts hereinafter made by or on behalf of the Mayor and City Council of Baltimore with any person or persons or corporation, for the performance of any work with the City of Baltimore, shall be deemed and considered as made upon the basis of eight hours constituting a day's work, and it shall be unlawful for any such person or persons or corporation to require or permit any laborer, workman or mechanic to work more than eight hours per calendar day in doing such work, except in the cases and upon the conditions provided in section 516 of this article."

The statute further provides that any officer of the municipality, or any person acting under or for such officer, or any contractor or sub-contractor or other person acting for them, violating any of these provisions, shall be fined not less than ten dollars nor more than fifty dollars for every offense; and

concludes with an exclusion of the employees of the fire department, of Bay View Asylum, and of the jail, from the operation of the act. Acts of 1910, ch. 194, pp. 642-644; Baltimore City Charter & P. L. L. (1927), secs. 516, 516A-C, pp. 323, 324.

The bill of complaint alleges that the Mayor and City Council of Baltimore found it necessary to provide extensive sewers and drains in various sections of the city, and for this purpose and with the approval of the sewerage engineer the municipality entered into eight separate contracts with a like number of distinct legal entities which undertook the construction of the several public improvements. In every one of the eight contracts there was a general stipulation by whose terms it was agreed that the building of the respective sewers and drains should proceed in conformity with the provisions of the statute quoted, and that the several promisors should indemnify and protect the municipality, its officers, agents, and servants, against any claim or liability growing out of their violation.

The contractors began the building of the sewers and drains under the supervision and direction of the engineer of sewers, a municipal official, and, while the work was being done, the bill of complaint on this record was filed against the municipality, its engineer of sewers, and the eight contractors.

In addition to what has been stated, the bill of complaint alleges that it would be some time before the drains and sewers would be completed; and that, in disregard of the statute and the terms of the contracts, the municipality, its engineer of sewers, and the eight other defendants, were permitting and requiring the laborers, workmen and mechanics, while employed in the building of the several drains and sewers, to work more than eight hours per calendar day, without there being any emergency arising in time of war or a necessity to protect thereby property or human life. The plaintiffs further aver that the defendants, although asked to stop, have continued in this violation of the statute; and that it is the intention of the defendants "so to disregard and violate said provisions and requirements of said sections of the charter of

Baltimore City and to disobey, nullify and set the same at naught," unless restrained by the chancellor.

The plaintiffs are (a) the International Union of Operating Engineers, Local Union No. 37, a labor organization, for the social and economic benefit and general welfare of its members, who are largely residents, citizens, and taxpayers of Baltimore City; and (b) James J. Anderson and William Howard Erskins, who are officers of Local Union No. 37, and who, with Michael Chapman, the fourth and other plaintiff, are members of the local union, and mechanics and workmen, residents, citizens and taxpayers of Baltimore City. The bill of complaint is declared to be, not only for the benefit of the plaintiffs, but also for that of all other taxpayers, citizens and residents of the City of Baltimore, who may desire to come into the proceedings as complainants. No one, however, has intervened. The plaintiffs are those who began the proceedings; and, because of their averred interest in securing and maintaining the object of the local union, in reducing the hours of labor, in securing a higher standard of wages, in elevating the moral, social, and intellectual condition of its members and of all other workmen in Baltimore as well as elsewhere, and in the enforcement of the law generally in the municipality and, particularly, with respect to the hours of labor of those employed under contracts for public improvements, the bill charges that the subsisting and prospective violation of the statute in the manner described will so deprive the complainants of their rights as residents, citizens, and taxpayers as to cause them to sustain irreparable loss and injury, for which they will have no adequate remedy at law.

The recited facts constitute the substance of the bill of complaint, which prays for general relief and the issuance of an injunction against the ten defendants, restraining them "from requiring or permitting any workman, laborer or mechanic to work more than eight hours per calendar day in or upon any work in or upon which they may be employed under or in the performance or execution of the contracts, or any of the same, made by or on behalf of the Mayor and

City of Baltimore with the defendant contractors, or any of them aforesaid, and from requiring or permitting more than eight hours to constitute a day's work for any of said laborers, workmen or mechanics, under or in the performance or execution of any of said contracts in the construction or building of sewers or drains for said City."

A number of the defendants interposed demurrers, which were overruled, and the injunction was directed to be issued in the form of the prayer, except that the chancellor added a provision suspending the operation of the injunction in cases of extraordinary emergency which may arise in time of war, or in cases where it may be necessary to work more than eight hours per calendar day for the protection of human life. Separate appeals were taken from this decree by the municipality and its engineer, and six of the other defendants.

The two major questions brought up on these appeals are the constitutionality of the statute and the right of the plaintiffs for relief by way of injunction. As each of these questions goes to the maintenance of the complaint in equity, they alone will be discussed.

1. The constitutionality of the Act of 1910, ch. 94, was unsuccessfully attacked in *Sweeten v. State,* 122 Md. 634, and in *Elkan v. State,* 122 Md. 642, which were both affirmed by a memorandum decision of the Supreme Court of the United States in *Elkan v. Maryland,* 239 U. S. 634, 60 L. Ed. 478. Our decisions and their later express affirmance by the Supreme Court were upon the authority of *Atkin v. Kansas,* 191 U. S. 207, 48 L. Ed. 148, which had under review a statute of Kansas, which was in every way similar to the Maryland enactment, except that the latter applied to a single municipality, while the former affected all those employed by or on behalf of either the state or any of its political subdivisions. In its disposition of the constitutional point, the Supreme Court, in *Atkin v. Kansas, supra,* confined its discussion to the power of the Legislature to limit the hours of work or labor of a public character done by or on behalf of either the state or a municipal corporation, but

apparently assumed that the further provision that those so employed should not be paid "less than the current rate of *per diem* wages in the locality where the work is performed" was necessarily included within the principle upon which the decision proceeded: "that the work being of a public character, absolutely under the control of the state and its municipal agents acting by its authority, it is for the state to prescribe the conditions under which it will permit work of that kind to be done. Its action touching a matter is final so long as it does not, by its regulations, infringe the personal rights of others, and that has not been done," Page 224. The view that the decision was an affirmance of the constitutionality of the act with respect to both the hours of labor and the minimum daily wage is sustained by the fact that the traverser was indicted, under the first count, for a violation of the one offense and, under the second count, for a violation of the other; and was found guilty and sentenced to pay a fine on each count of the indictment. His conviction and sentence were affirmed, first by the state tribunal, and then by the Supreme Court. And, so, in the Maryland cases cited. In *Sweeten v. State, supra,* the indictment contained thirty counts, the odd numbered counts were for a violation of the provision for a calendar day of eight hours, and the even numbered counts were for a payment of less than the daily wage current in the locality for a day's work of eight hours. The demurrer was to all the counts, and it was overruled. The accused was found guilty and sentenced, and this judgment was affirmed on appeal. While the opinion, on the constitutional question, followed the line adopted in *Atkin v. Kansas, supra,* yet the constitutionality of the limitation of the hours for a day's labor and of the minimum wage to be paid was necessarily involved in the judgment on appeal, which is decisive of the constitutionality of the Act of 1910, ch. 94.

The plaintiffs, however, urge that *Atkin v. Kansas, supra,* is no longer an authority, since it has been reversed by the recent decision of *Connally v. General Construction Co.,* 269 U. S. 385, 70 L. Ed. 322. In this case the proceedings were

begun to enjoin certain state and county officers of Oklahoma from enforcing the Oklahoma statute creating an eight hour day for all persons employed by the state or by any county, city, township or other municipality of the state, and providing that not less than the current rate of *per diem* wages in the locality where the work is performed shall be paid to those so employed by or in behalf of the State or its political subdivisions. Penalties are denounced against the violation of these enactments, and the injunction was sought to prevent their ruinous imposition, through threatened criminal prosecution for an alleged failure of the plaintiff, who was employed by the state in the building of a public improvement, to pay to its employees the prescribed wages.

It is a condition for the commission of a crime within the contemplation of the statute that there be an actually existing current rate of daily wages in the locality where the work is being performed. The averments of the bill, as well as the official investigaton, showed that no current rate of wages obtained where the work was being performed, so the defendant, which had observed the eight hour day legislation, was guiltless of crime, and the bill could have been sustained on that ground, which was the one that persuaded Mr. Justice Holmes and Mr. Justice Brandeis to concur in the result. The majority of the court, however, rested their conclusion on the proposition that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law"; and enforced this rule against the law, which was declared to be fatally defective as a criminal statute because, in the first place, the words "current rate of wages" do not denote a specific or definite sum, and, in the second place, the qualifying word "locality" is not descriptive of the area included.

The opinion does not refer to the cases of *Atkin v. Kansas*, 191 U. S. 207, 48 L. Ed. 148, nor to *Elkan v. Maryland*, 239 U. S. 634, 60 L. Ed. 478; and, until the Supreme Court shall expressly reverse these cases, it is our judgment that

uniformity and certainty in the administration of the criminal law in this state should constrain us to follow our decisions in *Sweeten v. State* and *Elkan v. State, supra.* It would seem that this course is, also, indicated by considerations of great weight.

As stated, if no current rate of wage exists within the terms of the statute, no crime is committed, no matter what may be the wage paid. So, the question is, fundamentally, one of fact, but the necessity for a fact to be proved does not make the fact so in issue indefinite or uncertain. And here the statute itself aids in the definition. The wage is not of every man, but the wage of a laborer, a workman, or a mechanic, so the inquiry is confined to three distinct, large, and familiar classes, whose wages are of common knowledge or easy ascertainment. Then the wage is not what one of these classes would receive on a weekly, monthly, yearly or periodic basis, but day by day; and, moreover, this daily wage must be the *current rate* of his class similarly employed and paid in the *locality* where the public work is to be performed. As here used, the term "current rate" means the charge for or valuation of the daily labor in question according to a scale or standard generally received or established by common consent or estimation. Wages, particularly those of such numerous classes as laborers, workmen, and mechanics, tend to uniformity and stability and so to an average or ordinary rate, which varies somewhat from place to place, and which Adam Smith speaks of as the "natural rates of wages" at the time and place in which they commonly prevail. *Wealth of Nations,* ch. VII. Hence, to restrict the current rate of the wages paid to the standard of the "locality" where the work is to be performed is an aid to certainty unless the word "locality" is intrinsically incapable of a definite meaning when construed according to accepted canons. A problem in construction of a statute is not to be abandoned until all the resources of the art are exhausted.

While "locality" is a word of relative meaning, its context commonly determines its meaning (*Clinton v. Worcester*

*Consol. St. R. Co.,* 199 Mass. 279), and it has been held to mean neighborhood, vicinity, or the whole or part of a political unit. *Foster v. Hart Consol. Min. Co.,* 52 Colo. 459; *State v. Tibbetts,* 21 Okla. Cr. 168; *State v. Fremont etc. R. Co.,* 22 Neb. 329; *Pierce v. Dillingham,* 96 Ill. App. 300, 313; *City of Butte v. School District No. 1,* 29 Mont. 336. Nor has the use of the word "locality" been found incompatible with the certainty required in a statute imposing criminal penalties, since section 3 of the Interstate Commerce Act declares it "unlawful for any common carrier to make or give any undue or unreasonable preference or advantage to any particular person, company, corporation or *locality,* or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or *locality* or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever," and section 10 denounces the penalties for a violation of this section. *U. S. Code, Annot.,* title 49, ch. 1, sec. 3, par. (1), pp. 157, 158, 164-165, sec. 10, pp. 354-6; *Houston, E. & W. T. Ry. Co. v. United States,* 234 U. S. 342, 354-360, 58 L. Ed. 1341, 1349-1351; *Cincinnati, H. & D. R. Co. v. Interstate Commerce Comm.,* 206 U. S. 142, 157, 51 L. Ed. 995, 1002; *Railroad Commission v. Chicago, B. & Q. R. Co.,* 257 U. S. 563, 578-580, 66 L. Ed. 371, 379, 380; *New York v. United States,* 257 U. S. 591, 66 L. Ed. 385. Another illustration is found in the similar provisions incorporated in the Public Service Commission Act of Maryland, Code, art. 23, secs. 365, 387, 400, 383. *State v. Fremont, E. & M. V. R. Co.,* 22 Neb. 329; *Murphy v. Worcester Consol. St. R. Co.,* 199 Mass. 279.

Thus it appears that the word "locality" has a place in important and enforced legislation; and, whatever may be the scope of its varying significance, its meaning in a particular statute is susceptible of being determined from the context, since the words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object which the legislature had in view. *Endlich, Interpretation of Statutes,* sec. 73. When so read it is

quite evident that, in the statute before the court, "locality" imports the area which embraces not only the actual site where the public work is to be performed but also such adjoining territory within which there then prevails a current rate of daily wages for the particular work to be done. In other words, "locality" defines a region, with the public undertaking as an axis or focal point, throughout which region the daily wage of the particular class to which the worker belongs is uniform.

The clause, "the current rate of per diem wages in the locality where the work is performed," may therefore be held to mean the charge for or valuation of the daily toil of a laborer, workman or mechanic, as the case may be, at a given labor, according to a scale or standard of money compensation then generally received or established by common consent or estimation throughout an area which includes, not only the actual site where the public work is to be performed, but also such adjoining territory within which the compensation does prevail. The construction adopted will assure the fulfilment of the legislative intention without being violative of any constitutional right or rule of law. In short, labor has its market value. *United States v. Amer. Tobacco Co.,* 221 U. S. 106, 178-181, 55 L. Ed. 663, 693-694; *Standard Oil Co. v. United States,* 221 U. S. 1, 67-68, 55 L. Ed. 619, 647, 648. The determination of this value is a familiar problem in a suit on a *quantum meruit* for work and labor; and its solution is by testimony establishing the usual price paid for like services at the time and place of performance. *Sutherland on Damages* (4th Ed.), secs. 679, 680. Again, the restriction imposed by the act is in respect to the minimum daily wage, and there is no inhibition to paying a greater or maximum wage. See *Campbell v. New York City,* 224 N. Y. 317, reported in 50 *A. L. R.* 1473, 1479, and there annotated. It is common knowledge that every contractor undertakes a public work upon the basis of the then cost of labor at the place of performance. The labor cost is usually the principal item of construction. So, it is not unreasonable to impute to a contractor the knowl-

edge which the nature of his business, and its prosecution, required him to possess, or which might have been obtained by reasonable investigation.

In *Nash v. United States,* 229 U. S. 373, 57 L. Ed. 1232, it was objected that the uncertainty of the prohibitions of the Sherman Anti-Trust Act made it unconstitutional. To the contention that the crime as defined by the statute contained an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men, the court, through Mr. Justice Holmes, replied: "The law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or short imprisonment, as here; he may incur the penalty of death." Pages 376, 377. See *Miller v. Strahl,* 239 U. S. 426, 434, 60 L. Ed. 364, 368; *Fox v. Washington,* 236 U. S. 273, 277, 59 L. Ed. 573, 575; *Omaechevarria v. Idaho,* 246 U. S. 343, 348, 62 L. Ed. 763, 768; *Hygrade Prov. Co. v. Sherman,* 266 U. S. 497, 501-503, 69 L. Ed. 402, 407-8; *Whitney v. California,* 274 U. S. 357, 368, 369, 71 L. Ed. 1095, 1102-3; *Heim v. McCall,* 239 U. S. 175, 191, 60 L. Ed. 206, 216. And compare *Cline v. Frink Dairy Co.,* 274 U. S. 445, 71 L. Ed. 1146. The Maryland statute under discussion erects a definite standard of conduct and supplies the criteria which, when applied to actual and easily ascertainable facts, will indicate with certainty to any reasonable person what acts will constitute the crime denounced by the statute. It is these circumstances which distinguish the case at bar from *Cline v. Frink Dairy Co., supra,* and similar decisions therein mentioned, and bring it within the cases last cited.

Despite the ruling in *Connally v. General Construction Co.,* 269 U. S. 385, the weight of precedent in the Supreme Court and of argument support the Maryland decisions, which will, therefore, be followed. The validity of the minimum wage requirement of the statute is so important in the administration of the criminal law on the subject

that the court could not well refrain from this expression of opinion, although its invalidity would not render the eight hour day provision void, since the two are not so connected in subject matter, meaning or purpose that it can not be presumed that one would have been passed without the other. *Painter v. Mattfeldt,* 119 Md. 466, 474; *Hall v. State,* 121 Md. 577, 582; *Levin v. Hewes,* 118 Md. 624, 648; *Murphy v. Wheatley,* 100 Md. 358, 364, 365; *Steenken v. State,* 88 Md. 708, 710.

2. The second major inquiry is the right of the plaintiffs to relief in equity. In *Bauernschmidt v. Standard Oil Co.,* 153 Md. 647, 651, 652, the court, speaking through Judge Pattison, stated: "The rule, or principle of law, applicable and controlling in this class of cases, is well settled, that private citizens cannot restrain public wrongs, unless they allege and prove damage to themselves different in character from that sustained by the public generally, nor can taxpayers restrain official acts upon the mere ground that they are *ultra vires*. *Houck v. Wachter,* 34 Md. 265; *Crook v. Pilcher,* 61 Md. 510; *Garitee v. Baltimore,* 53 Md. 436; *Turner v. King,* 117 Md. 403, and other cases.

As was said by this court, speaking through Judge Burke, in *Turner v. King, supra*: "Public wrongs are not to be redressed at the suit of individuals who have no other interest in the matter than the rest of the public. To give them a standing in a court of equity, they must allege and show that by the wrong committed they suffer some special damage or that they have a special interest in the subject matter distinct from that of the general public."

The eight independent contracts described in these proceedings are valid and unquestioned and, consequently, there is no equity growing out of their form or content; and no other source of complaint exists, unless it be in the performance of the contracts. But not one of the plaintiffs is either a party to any of the contracts or in privity with any of the contracting parties. Nor is a single plaintiff shown to have been employed by the defendants in any labor or in any capacity, at any time, during the building of the public im-

provements. It follows that the plaintiffs are not suing because of any invasion of a private right of property, nor as a result of the infliction of some special injury or damage, distinct from that of the general public, and that no legal or equitable right of the plaintiffs has been infringed, unless the fact that the plaintiffs are taxpayers of Baltimore City constitute them, with those in similar circumstances, a class specially damaged by the threatened continued violation of the eight hour law.

The leading case in Maryland on the right of a taxpayer to an injunction is *Baltimore v. Gill,* 31 Md. 375, where it was said: "It is certainly well settled that public wrongs cannot be redressed at the suit of individuals, who have no other interest in the matter than the rest of the public. Thus an individual cannot maintain a bill of injunction to prevent a public nuisance, unless he suffers thereby some special damage; and the principle governing cases of this kind has been supposed to be applicable to the present case. But it appears from the averments of the bill that these complainants, as taxpayers of the city, and others similarly situated, in whose behalf as well as their own the bill is filed, constitute a class specially damaged by the alleged unlawful act of the corporation in the alleged increase of the burden of taxation upon their property situated within the city. The complainants have therefore a special interest in the subject matter distinct from that of the general public."

The special damage which the taxpayer of the political division sustains in a public wrong is the prospective pecuniary loss incident to the increase in the amount of taxes he will be constrained to pay by reason of the illegal or *ultra vires* act of the municipality or other political unit. Hence, the taxpayer's interest in the subject matter is not general, but special only, because of the future individual monetary burden cast upon him or his property. The subsequent decisions have consistently maintained the rule, and have sanctioned the relief by injunction whenever it appeared that the taxpayer complaining would sustain a pecuniary loss, distinct

from that of the general public, by reason of increased taxes, whether such increase resulted from an *ultra vires*, illegal or void order (a), contract (b), ordinance (c), or statute (d) in reference to an assessment of property, or to the levy, collection, expenditure, appropriation, or diversion of public taxes.

(a) *Peter v. Prettyman*, 62 Md. 566; *Schley v. Lee*, 106 Md. 390; *Weller v. Mueller*, 120 Md. 633; *Magruder v. State Roads Comm.*, 125 Md. 525; *Fisher & Corozza Co. v. Mackall*, 138 Md. 586, 597. (b) *Baltimore v. Keyser*, 72 Md. 106; *Balto. & D. P. R. Co. v. Pumphrey*, 74 Md. 86; *Packard v. Hayes*, 94 Md. 233; *Rushe v. Hyattsville*, 116 Md. 122; *Weber v. Probey*, 125 Md. 544; *Bennett v. Baltimore*, 106 Md. 484. (c) *Baltimore v. Gill*, 31 Md. 375; *St. Mary's Industrial School v. Brown*, 45 Md. 310; *Joesting v. Baltimore*, 97 Md. 589. (d)*Christmas v. Warfield*, 105 Md. 530; *Painter v. Mattfeldt*, 119 Md. 466; *Graf v. Hiser*, 144 Md. 418; *Dahler v. Washington Suburban Sanitary Co.*, 133 Md. 644; *Montgomery County v. Henderson*, 122 Md. 533; *Dillon on Municipal Corp.* (5th Ed.), secs. 1583, 1587.

An increase of taxation would have resulted from the municipality entering into an illegal and void contract involving the wrongful expenditure of public funds in *Baltimore v. Keyser*, 72 Md. 106, where the rule is stated as no longer being an open question, and where the only problem for a decision was the validity of the award of a municipal contract. Pages 108, 110, *et seq.* It was in considering this branch of the case that the court remarked that the validity of the contract assailed did not turn upon the advantage of its terms but upon whether certain mandatory requirements of the ordinance authorizing the contract had been fulfilled. The point at issue was the power of the municipality to act without a compliance with these mandatory prerequisites, and, in emphasizing the necessity of a conformity to the conditions of the ordinance, this further comment was made upon the authority of the public officials: "They had no power to make a contract except in the mode and manner prescribed

by law, and we agree with the court below that the complainants have a right to require that the money they have contributed for the public benefit shall be spent only for the purpose and in the manner authorized by law, and that every security designed to protect its proper expenditure shall be faithfully observed. This right is a vital one to them, and they are required to allege no other injury than that it is about to be violated. They will be injured if the violation is permitted by the act of violation alone." Page 114. In the case in which this statement appears, the court did not have before it for decision the manner in which a valid contract was being performed, but the legality of a municipal contract; and the court was considering the effect upon the validity of this contract of the absence of certain antecedent conditions which the legislature, in order to safeguard the interests of the public in the proposed expenditure, had specified must be fulfilled before a contract could be executed. The meaning, therefore, is to be ascertained not only from the language used, but also from the context and the subject matter, which make it clear that the reference is to the mode and manner prescribed by the ordinance in the making of the contract; and to the absence of any necessity for the pleader to allege the facts from which the special damages to be sustained by the plaintiffs, because of the illegal action of the municipality, would appear. Any expenditure of taxes in discharge of a void contract would manifestly result in a loss to the taxpayers through the diversion of funds to an unlawful purpose; and, so, an averment of the proposed wrongful act is sufficient, under the circumstances, to show a special damage or interest in the taxpayer, who "will be injured, if the violation is permitted, by the act of violation alone." Pages 114, 115. While the violation of the ordinance was a public wrong, yet the averment of this violation would not have been sufficient if the mere act of violation had not necessarily implied some consequent special damage to be suffered by the taxpayers, by reason of their special and distinct interest in the subject matter.

The quoted passage in *Baltimore v. Keyser, supra,* is

thus seen not to introduce any conflict in the cases, and, in *Turner v. King,* 117 Md. 403, 410, *Baltimore v. Keyser, supra,* is relied upon to support the accepted rule: "Public wrongs are not to be redressed at the suit of individuals who have no other interest in the matter than the rest of the public. To give them a standing in a court of equity, they must allege and show that by the wrong committed they suffer some special damage, or that they have a special interest in the subject matter distinct from that of the general public. *Mayor etc. v. Keyser,* 72 Md. 108; *Mayor etc. v. Gill,* 31 Md. 375." See *Packard v. Hayes,* 94 Md. 233, 252, 253; *Fisher & Carozza Co. v. Mackall,* 138 Md. 586; *Anne Arundel County v. United Rys. Co.,* 109 Md. 377; *Konig v. Baltimore,* 128 Md. 476-478.

The rule embodied in this statement is a logical development of equitable jurisdiction whose subject matter is civil property; and injury to property, whether actual or prospective, is the foundation on which this jurisdiction rests. So, in matters merely criminal and which do not affect any right to property, a court of equity has no jurisdiction. A chancellor has no jurisdiction to restrain or prevent crime or to enforce a moral duty, except so far as the same is concerned with rights to property. *Kerr's Injunctions in Equity* (5th Ed.), sec. 1; *High on Injunctions* (4th Ed.), secs. 20, 20a, 27, 1415h; *Joyce on Injunctions,* secs. 59, 60a; *Pomeroy's Eq. Juris.,* sec. 1890.

It now remains to apply the established rule to this record, where the eight contracts are not *ultra vires* but valid; and where the plaintiffs have no standing in equity except as resident taxpayers of Baltimore. The work being done is for the use and to the advantage of the inhabitants of the municipality; and the compensation to be paid the eight contractors, when the work is satisfactorily accomplished in accordance with the terms of the contract, is not affected in the least by the alleged grievances of the plaintiffs. Hence, not only is there no averment of any possible pecuniary loss to the resident taxpayers, but it affirmatively appears that these tax-

payers will not sustain any special damage, and that their interest in the subject matter of the eight contracts is merely that of every resident of Baltimore. The failure of the contractors to observe the statute limiting the hours of work upon public improvements entails no appreciable momentary loss upon the taxpayers; and any violation of the law in that regard is a crime whose prosecution and punishment is of general interest. By recourse to familiar procedure of the criminal law, future violations of the statute will be prevented, but, as these offenses do not concern any property rights of the plaintiffs, equity will not intervene, but will leave the matter in the jurisdiction where it commonly belongs. *Sweeten v. State,* 122 Md. 634; *Elkan v. State,* 122 Md. 644.

An injunction should never issue except with care and caution (*Miller's Equity Proc.,* sec. 544), and the necessity for the exercise of this restraint is accentuated by the novelty of issuing an injunction on the sole ground of a prospective violation of the criminal law in the performance of the labor incident to the completion of a public improvement under a duly authorized and valid contract. Upon principle and on authority there is a distinction drawn between the prevention of public officials from doing a primary act, which is *ultra vires* or unlawful, as the making of a contract, of an assessment of property, of a levy of taxes or of an appropriation of funds; and the occurrence of secondary errors, irregularities, or criminal conduct in the course of the performance of a valid contract or of an authorized municipal function. The latter acts fall into a different category and, generally, do not justify the issuing of an injunction, since they are not of a fundamental character, and may be controlled or compensated by other remedies, and because equity has no supervisory power over public corporations and their officers. See *Baltimore v. Raymo,* 68 Md. 569, 572, 579; *Dashiell v. Baltimore,* 45 Md. 629; *Hamilton v. Carroll,* 82 Md. 326, 337, 338; *Konig v. Baltimore,* 128 Md. 465, 473, 474; *High on Injunctions* (4th Ed.), secs. 1255, 1256; *Dillon on Munic. Corp.* (5th Ed.), sec. 1465, p. 2628.

594

To enjoin the breach of the statute in the cause at bar would require the court to assume and exercise a vigilant and constant supervision over the hours of labor of those engaged upon the building of the eight several improvements, in order to enforce a criminal law, whose violation does not tend to the destruction or impairment of the property or property rights of the plaintiffs. If the court were to attempt a task of such obvious and inherent difficulty, it would proceed under no recognized head of equity jurisdiction.

Should all or any of the several contractors persist in the violation of the law, their offence is not purged by the inaction of the Mayor and City Council of Baltimore, and its officers, but the crime remains, and may be prosecuted to conviction by a procedure which is best adapted to the prevention of the crime alleged, by assuring a certain punishment of guilt through the simple, prompt, efficient, and familiar processes of the criminal law. The language of Chancellor Kent in *Attorney General v. Utica Insurance Co.*, 2 Johns. Ch. 371, has lost neither point nor significance; "The whole question is one of law and not of equity. The charge is too much of the nature of a misdemeanor to belong to this court. The process of injunction is too peremptory and powerful in its effect to be used in such a case as this without the clearest sanction. I shall better consult the stability and utility of the powers of this court by not stretching them beyond the limits prescribed by the precedents." See *High on Injunctions* (4th Ed.), sec. 20, n. 9, p. 29; *Baltimore City Charter & P. L. L.* (1927), secs. 516, 516A, 516B, 444, pp. 323, 324, 303.

The plaintiffs, therefore, have no legal right, and the defendants are under no legal liability to the plaintiffs at law or in equity; so the bill was bad on demurrer and should have been dismissed so far as the appellants are concerned. *Williams v. Baltimore,* 128 Md. 140, 142, 158; *Turner v. King,* 117 Md. 403, 407-410; *Kelly Piet & Co. v. Baltimore,* 53 Md. 134, 140, 141; *Davidson v. Baltimore,* 96 Md. 509, 513; *Bauernschmidt v. Standard Oil Co.,* 153 Md. 647, 651; *Sellman v. Sellman,* 63 Md. 520, 522; *Boyd*

*v. Park Realty Corp.,* 137 Md. 36, 40; *Consolidated Gas Co. v. North. Cent. Ry. Co.,* 107 Md. 671, 674; *McCabe v. Atchison etc. Ry. Co.,* 235 U. S. 151, 163, 164, 59 L. Ed. 169-175.

> *Decree reversed as to the eight appellants, with the costs below and in this court to the appellants; and cause remanded for a decree in conformity with this opinion.*

---

Adkins, J., filed the following dissenting opinion.

I cannot concur in the opinion of this court. In my judgment it entirely ignores the spirit of the cases of *Baltimore v. Keyser,* 72 Md. 106; *Konig v. Baltimore,* 126 Md. 606, and *Konig v. Baltimore,* 128 Md. 465, in all of which it was held that, in the suit of a taxpayer, it is not necessary to allege or prove that the taxpayer would be injured pecuniarily, but that it was enough if a fund to which the complaining taxpayer contributed was being or about to be illegally spent. It certainly cannot be said that the taxpayer's money is not being illegally spent when it is used in a manner directly prohibited by statute. And this the bill expressly alleges. We are dealing only with a demurrer to the bill.