## Capo v. Kane et al.

*Stewart & Lewis*, for plaintiff.

*A. W. Powell*, for county controller.

*Charles Alvin Jones*, county solicitor, and *Walter P. Smart*, assistant county solicitor, for county commissioners.

Before Rowand, Moore, and Gardner, JJ.

PER CURIAM, November 25, 1936.—Plaintiff, a taxpayer, seeks an injunction enjoining and restraining the

county commissioners from authorizing or approving the expenditure of or the expending of any further funds of the County of Allegheny on the project mentioned in the bill; enjoining and directing the revocation of the designation of the heaters of the Troop Water Heater Company; enjoining the commissioners from proceeding any further in the prosecution of the work; that the contracts referred to in the third paragraph of the bill be declared illegal and void.

The bill of complaint sets out that bids on a certain project of Allegheny County, known as Contract No. 2—Plumbing—North Park—North Park Swimming Pool—P. W. A. Penna. Docket 7000—Project B, were duly advertised on November 23, 1935; that on December 12, 1935, the then county commissioners opened bids on said project, and on April 25, 1936, the proposed contracts were approved by the State director of the Federal Public Works Administration, including, inter alia, a contract with John A. Galbreath, providing, inter alia, for water heaters; that paragraph 47 of the specifications for plumbing provided for the furnishing and installing complete of seven instantaneous hot water heaters of certain sizes therein designated of the "Ruud, Troop, or Pittsburgh make or equal, as approved by the director"; that the said John A. Galbreath on October 6, 1936, submitted to the Director of Works of Allegheny County for his approval the source of supply of the water heaters, designating either the heaters of the Troop Water Heater Company or of the Pittsburgh Water Heater Company; that on October 9, 1936, the said Director of Works of Allegheny County approved the heaters of the Troop Water Heater Company; that the vesting in the Director of Works of Allegheny County the authority of designating the type of heater is illegal, and that it prevents a common standard for bidders.

To this bill, defendants Kane, Rankin, Herron, and Laboon have filed four preliminary objections:

First: The bill shows on its face that the plaintiff has no interest in the subsequent matter of the bill of complaint.

Second: The bill shows on its face that the plaintiff is guilty of laches and is seeking to enjoin any further prosecution of the project when the project is nearly completed, and it is alleged that over $545,000 has been expended thereon, whereof the County of Allegheny has supplied $299,802.96.

Third: The bill discloses no facts which would justify the court in entertaining the bill or in granting the relief prayed for.

Fourth: The averments in the bill of complaint are so ambiguous and so mixed with conclusions of law and are so insufficiently averred that it is not possible for defendants to make answer thereto in proper and adequate manner.

In support of the first objection, defendants have cited cases from other jurisdictions to the effect that a taxpayer, in order to maintain an action to enjoin a municipality from awarding contracts, must show not only an illegal act on the part of the city officials, but one the illegality of which must tend to the detriment of the city either by dissipation of its funds or by the threats of other injury so imminent and substantial as to make it proper that the taxpayer be protected by injunction. The cases cited in support of this are Harlan et al. v. Employers' Association of Maryland et al., 159 Atl. 267 (Md.) ; Ruark, etc., et al. v. International Union of Operating Engineers, etc., et al., 157 Md. 576; Campbell v. City of N. Y. et al., 244 N. Y. 317; and Bohn v. Salt Lake City et al., 79 Utah 121, 8 P. (2d) 591.

However the law may be in other jurisdictions, the law in Pennsylvania is clearly laid down in Page v. King et al., 285 Pa. 153, where the court said:

"Appellant's right as a taxpayer, having an interest in public funds, to maintain a bill to prevent an un-

authorized or unlawful expenditure of state money cannot now be questioned: Frame v. Felix, 167 Pa. 47, 49. It is immaterial whether the individual loss is great or small; the court will not stop to inquire into that."

The bill alleges that the plaintiff is a resident, property owner and taxpayer of the County of Allegheny, Commonwealth of Pennsylvania, and brings this bill on his own behalf as such taxpayer and, as well, on behalf of any taxpayer of Allegheny County who may join therein. Therefore, under the authority of Page v. King et al., supra, the plaintiff has such interest as to entitle him to maintain the bill.

The next objection is that the plaintiff is barred by laches from maintaining his bill. It is argued by the defendants that because the plaintiff stood by until the county had expended $545,000, and had substantially completed the work, with the exception of the installation of the water heaters and a few other minor matters, the plaintiff is now barred on account of laches from enjoining the spending of any further sum on account of this contract. The plaintiff is not seeking to enjoin any payment of money due the contractor which was earned before the bill was filed, but is seeking to enjoin the payment of any further funds under the contract which plaintiff claims is illegal and void. If the contract is illegal and void, then, of course, the commissioners and the county controller have no rights to expend any further funds of the county.

In State v. Cass, 32 Ohio Circuit Ct. R. 208, the court said at page 213:

"If the contract be in fact illegal and without authority of law, then the plaintiff is not estopped, no matter how much money the defendants or any of them may have expended in its partial execution, from enjoining the further execution of the contract, or the payment thereon of any of the public funds."

In Plumley, Admx., v. County of Whiteside et al., 164 Ill. App. 621, it was held that laches was not avail-

able as a defense in a suit to restrain county authorities from carrying out an ultra vires contract although the work had been partially performed. In Bartlett v. Doherty, 10 Fed. Supp. 465, the court held: "Laches cannot be set up as defense to validate a contract which is against public policy." In Smith v. City of Phila., 227 Pa. 423, where an injunction was sought by a taxpayer after all the work had been done on a municipal contract and there had been a failure to comply with the law with respect to competitive bids, an injunction was awarded restraining the payment of the funds to the city.

We are, therefore, of the opinion that the defense of laches will not prevail.

The third point raised by the preliminary objections, namely, that the bill does not disclose facts which would justify the court in entertaining the bill or in granting the relief prayed for in the bill, goes to the meat of the question involved in this case.

The project out of which the contract in controversy grew was a Federal aid project in which the county expended 55 percent of the total outlay and the other 45 percent was a grant from the Federal Government. To obtain this grant, it was necessary to meet the requirements of the Federal agency. These requirements of the Federal Public Works Administration were contained in the contract and were set forth in the specifications, headed "Instructions to Bidders". They provide that no laborer or mechanic shall be employed on this project who has not been a resident of the State of Pennsylvania for at least 90 days prior to his employment; that preference in employment shall be given to persons from the public welfare rolls, and, except with the specific authorization of the Works Progress Administration, at least 90 percent of the persons employed on any project shall have been taken from the public relief rolls. It provides that the maximum hours of work for manual labor shall be eight hours per day and 130 hours per month;

and that the contractor shall not knowingly employ any person engaged in any other gainful occupation whose weekly hours of labor in such occupation together with his hours of labor on the project exceed the limitations of hours prescribed for employes of his classification under the contract. It fixes the minimum price which shall be paid to each employe. It provides that the contractor and each subcontractor shall prepare payrolls in accordance with instructions to be furnished by the Works Progress Administration and shall submit such payrolls to the Works Progress Administration; and that the contractor and subcontractor shall submit reports to the Works Progress Administration covering the purchases of and requisitions for materials, together with such other information as may be required. It requires that the contractor, subcontractors, materialmen, or suppliers shall use only such unmanufactured articles, materials and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States. It further provides that the contractor and each subcontractor shall report monthly to the United States Department of Labor.

It is contended by the plaintiff that these Federal regulations, insofar as they require the payment of minimum wages, maximum hours of work, the employment of certain persons, and the purchase of materials of certain types, are violative of the provisions of the statutes requiring contracts to be let to the lowest responsible bidder, and, in addition, that these Federal regulations necessarily involve an unlawful delegation of the official duties of the county commissioners to the discretion of Federal authorities.

In Frame v. Felix et al., 167 Pa. 47, where there was a provision in the specification of a municipal contract

requiring the contractor to employ no one not a citizen of the United States and to pay not less than a stipulated wage per day, it was held that these provisions were in violation of the Act of May 23, 1889, P. L. 277, providing that municipal work be let to the lowest responsible bidder. In Commonwealth v. Casey, 231 Pa. 170, it was held that an act of the legislature regulating the hours of workmen employed by the State or municipality was in violation of article III, sec. 7, of the Constitution. In Taylor v. Philadelphia, 261 Pa. 458, it was held that an ordinance requiring that the cutting and preparing of stone for a public library should be done in the City of Philadelphia was invalid, and the contract was awarded to another bidder because such provision conflicted with the statutory provision requiring contracts to be let to the lowest responsible bidder. In Elliott v. City of Pittsburgh et al., 6 Dist. R. 455, where the City of Pittsburgh had passed an ordinance requiring union labor to be employed on a municipal project, our own court said:

"The Act of Assembly of May 23, 1874, P. L. 233, requires that all contracts for work to be done for the city shall be performed under contract 'to be given to the lowest responsible bidder.' This requires a free and open competition by all persons who may wish to bid. Limiting the contractor to employ only a certain class of workmen, without regard to qualifications, prevents free and open competition, and may result in a higher price for the work than would be bid by equally competent and responsible contractors, who would not bind themselves to employ only the class of workmen designated in the ordinance. The city has a right to protect itself from improper materials or unskillful work, and that can be done whoever the contractor may be. No doubt there are just as competent contractors and just as skillful workmen who do not belong to the associations referred to in the ordinance as those who do.

"The city has no right to say that the 'Building Trades Council of Pittsburgh,' and they only, shall designate the

workmen who may be employed on any city work. That is what this ordinance does. . . .

"We consider the ordinance illegal, beyond the power of the councils, in the particulars above indicated. Bids should be free and open to all competitors, and contracts awarded to the lowest responsible bidders without the limitations and restrictions imposed by said ordinance."

In Fiske v. People ex rel., 188 Ill. 206, a restriction in a city contract providing for hours of labor to be eight hours a day was held to be unconstitutional as an infringement upon the freedom of contract. In Bohn v. Salt Lake City et al., supra, it was held that a municipality had no right at all to fix a minimum wage in a public contract. In that case, speaking of a provision in the proposals for bids restricting the choice of workmen to those controlled by the board of commissioners, the opinion proceeds, page 150:

"It is further to be observed that one of the provisions embodied in the proposals for bids and contracts . . . let for the construction of the work requires the contractor to employ all workmen therefor through the agency appointed, controlled, and directed by the board of commissioners. While the contractor is permitted to select workmen furnished and supplied by such agency under rules and regulations promulgated by it and approved by the board of commissioners, yet otherwise he is given no choice in the selection of his workmen, and thereby a substantial limitation and restriction is put upon competition and opportunity in obtaining labor, as well as to the character and quality of it, except as the contractor may be able to select it through those good, bad, and indifferent furnished and supplied by the agency. By his contract, the contractor is held to a strict compliance with the plans and specifications prepared and submitted by the city and to a full completion of the work to its satisfaction, and is in every way held liable and responsible for the manner in which the work is done by his work-

men, yet, to a substantial degree, is limited and restricted in the selection and hiring of his workmen. By the contract he even is not given the right, for cause or otherwise, to discharge any of his workmen, except as may result from a rotation of them as by the contract and rules and regulations of the agency provided. That such a provision materially affects competitive bidding and tends to influence the conclusion to be reached by a responsible bidder as to the amount or price for which he, in view of such restriction, may be willing to undertake the construction of the work, may not well be doubted. It is conceivable because of such and of other complained of provisions, that some responsible bidders would even decline to bid or enter into contracts to do the work under such conditions and restrictions imposed and required. If competition with respect to any material element by proposals for bids and by contract be limited or restricted, the very purpose of submitting proposals for bids to obtain contracts to do the work at a reasonable and practical cost, is to that extent impaired, if not destroyed."

Nowhere in the statutes of this Commonwealth is there any power conferred upon the county authorities to fix the rates and hours of work.

It is contended by the plaintiff that the provisions of the contracts and regulations of the Public Works Administration necessarily involve an unlawful delegation of the governmental functions and duties of the county commissioners to the Federal authorities. The following stipulation was contained in the specifications:

"Each bidder, in submitting his proposal, shall do so with a view to absolute compliance, and each contractor to whom a contract is awarded shall comply absolutely, with each and every of the requirements of the Federal Government relative to P. W. A. projects, which requirements are in the highest degree mandatory. In the event of any conflict between any such requirements (whether of a general nature or special to the particular case) and

any provision or provisions of any of the contract documents, the federal government requirement shall control, and the conflicting provision or provisions shall be understood as modified to the extent necessary to avoid such conflict, and to the extent only."

In Illinois Power & Light Corp. v. City of Centralia, Illinois, et al., 11 Fed. Supp. 874, where a similar contract was under discussion, the court said, p. 888:

"Clearly the delegation of authority contemplated in this act to the Administrator to fix and control the 'terms and conditions' upon which the public work of the city is to be done violates the principles laid down in the authorities quoted, and must, as it applies to the facts here involved, be held void. . . .

"The contract with the Administrator, providing as it does for letting of public contracts, lacking in the essentials of free competitive bidding, cannot be approved."

It would therefore appear that under the decisions in this and other jurisdictions, the contract in question should be declared illegal and void as being in violation of the right of free competitive bidding as set forth in our statutes.

The fourth point raised in the defendants' answer is that the averments in the bill are so ambiguous, as to make it impossible for the defendants to make answer thereto. The bill avers the letting of the contract and attaches as exhibits the contracts and all documents in connection therewith, avers the letting of the particular contract involved in the case, and avers the grounds upon which the contract is illegal and void. Certainly nothing more is required of a plaintiff in a bill in equity.

The bill further avers that the contract in regard to the water heaters is void and illegal in that paragraph 47 of the specifications calls for bids on Ruud, Troop, or Pittsburgh water heaters, or equal, and cites in support of his charge of illegality: Jenkins Twp. v. Public Service Comm., 65 Pa. Superior Ct. 122. It is true that a state-

ment in that case seems to uphold his contention, but that statement is clearly obiter dictum. The matter before the court in that case was whether a contract for lighting the borough should be approved by the Public Service Commission. The Public Service Commission did not approve the contract because there was already in existence in the borough a light company of financial responsibility which was giving adequate service and reasonable rates, and the company which sought to have its contract approved had no plant and was of unsatisfactory financial responsibility. This was the point in controversy and the point decided, and the statement made by the Superior Court that the bid was illegal was obiter dictum.

As opposed to the dictum in that case, we have the decision of our Supreme Court in Brener v. Philadelphia et al., 305 Pa. 182, where it was held that (*a*) a published request for alternative bids is proper where the subject matter is not capable of standardization; and (*b*) where a thing is protected by a patent or can not be bought in the open market and any one of a number of particular kinds fully complies with the established standards, the interests of the municipality will be best served by asking for bids from any or all.

It was also held in Parker v. Philadelphia, 220 Pa. 208, by Mr. Justice Fell:

" . . . the articles to be furnished are protected by patents and a uniform standard is established and any one of several patented appliances meets the requirements of the specifications, the asking for bids for any or all of them would certainly tend to secure rather than to prevent competition."

In Pearlman v. Pittsburgh et al., 304 Pa. 24, in calling for bids for water meters, the city, in its advertisement, specified three different makes by name, or their equal. This practice was not criticised by the Supreme Court.

The contractor, Galbreath, gave in his bid a choice between the Troop Water Heater Company and the Pitts-

burgh Water Heater Company, and gave to the director his choice of either one of the two, and it is not argued that the director abused his discretion in making choice of the Troop water heater. We are, therefore of the opinion that the letting of the contract to Galbreath was not illegal.

Under the foregoing decisions in Pennsylvania, it would appear that the contract in question is illegal and void as being in violation of our statutes providing for the letting of a contract to the lowest responsible bidder. However, in none of the cases cited did the question of legality arise in a situation similar to the present one. This situation arose out of an emergency, when millions of men were idle throughout the United States. The P. W. A. was organized for the purpose of creating work for the unemployed. Projects to the extent of many millions of dollars were started throughout the United States, to which the P. W. A. made grants for the purpose of encouraging municipalities to undertake public work. Since the primary purpose was to put men to work, the Federal Government, as a consideration for these grants, wisely retained a certain control over the employment of the men required in order to see that this object was accomplished.

Federal grants to the amount of nearly $50,000,000 have been made in Pennsylvania to aid municipalities in the construction of public buildings, school buildings, streets, sewers, bridges, and other highly necessary projects, many of which are but partially completed. If we were to declare all municipal contracts involving P. W. A. labor illegal and void, great hardship would be visited on the various municipalities in securing sufficient funds for the completion of these projects. Thousands on unemployed rolls would be compelled to return to direct relief, and many contractors on these projects would be forced into bankruptcy. Further, if these contracts were declared illegal in Pennsylvania while they are legal under

the laws of other States, all Federal grants would be given to those States whose laws permit contracts, and the citizens of Pennsylvania would be compelled to contribute to these public works in other States by reason of their payment of Federal taxes, which is the only source from which the P. W. A. receives the money to make these grants.

"New occasions teach new duties"; and we are of the opinion that had a similar situation been before the Supreme Court when the foregoing cases were presented, they would have upheld the contracts on the ground of public policy. We accordingly refuse to strike down the contracts in the present case, on the ground that it would be against public policy to do so.

### Order of court

And now, to wit, November 25, 1936, the question of law raised by the third objection is decided in favor of the defendants, and the bill is dismissed.