THE ROLAND ELECTRICAL COMPANY *v.* MAYOR
AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 153, October Term, 1955.]

COLWILL CONSTRUCTION COMPANY ET AL. *v.*
MAYOR AND CITY COUNCIL OF
BALTIMORE ET AL.

[No. 154, October Term, 1955.]

(Two Appeals In Separate Records)

398

*Decided July 3, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Wilson K. Barnes,* with whom were *Anderson, Barnes & Coe* on the brief, for the appellants in both cases.

*H. Donald Schwaab, Assistant City Solicitor of Baltimore,* with whom were *Thomas N. Biddison, City Solicitor,* and *Edwin Harlan, Deputy City Solicitor,* on the brief, for the appellees in both cases, and by *Joseph Sherbow,* with whom were *Sherbow & Sherbow* on the brief, for the intervenors in Case No. 154.

BRUNE, C. J., delivered the opinion of the Court.

The appeals in these two cases, which were tried together in the Circuit Court of Baltimore City and were argued together in this Court, are from decrees which in each case upheld the validity of the prevailing wage ordinance of Baltimore City and of wage scales promulgated thereunder. In addition, the decree appealed from in No. 153 upheld the rejection by the City of a bid, or (as The Roland Electrical Company, an appellant, claims) the repudiation of a contract, for electrical wiring and fixtures in one of the City schools. The latter controversy grew out of the prevailing wage ordinance.

The principal attacks are directed against Chapter 653 of the Acts of the General Assembly of 1945, (usually referred to below as "Chapter 653") which constitutes subsection 4 of Section 6 of the Charter of Baltimore City (1946 Revision) and Ordinance No. 225 of the Mayor and City Council of Baltimore ("the City") approved July 3, 1945, which purports to be based upon Chapter 653, and the wage scales adopted by the Board of Estimates which, in turn, rest for support upon Ordinance No. 225, the Prevailing Wage Ordinance, which is usually referred to below either by the name or, more briefly, simply as "the Ordinance".

Chapter 653 added a new power to those previously granted to the City. Under it, the General Assembly expressly authorized the City "To provide by ordinance for incorporating in any and all contracts made by the * * * City * * *, or on its behalf, with any person, firm or corporation for the performance of any work, labor or services for said municipal corporation, the maximum number of hours which shall constitute a day's work for, and the minimum rate of wages or salaries to be paid to any and all classes of, employees of contractors and sub-contractors performing any kind of work, labor or services for said municipal corporation while such employees are engaged or employed in the performance of such work, labor or services, and for penalties to be imposed on such contractors or sub-contractors failing to comply with any and all hour and wage provisions contained in any such contract in which they are interested; and by ordinance to empower the Board of Estimates of said municipal corporation to exercise any and all the power and authority herein granted to said municipality and make any and all rules and regulations and do any and all things, from time to time, that may be necessary or proper to put into operation and effect any and all of the aforegoing provisions."

Chapter 653 also repealed prior inconsistent laws and carried a separability clause.

The Prevailing Wage Ordinance undertakes to exercise the authority conferred by Chapter 653.

Section 1 provides that "each and every contract" made by or on behalf of the City "for the construction, reconstruction,

\* \* \* installation, alteration, repair, maintenance, \* \* \* grading, paving, repaving \* \* \* excavation or any other operation or work to be done or performed in, on, upon or in connection with any building, bridge, viaduct, tunnel \* \* \* or other structure, airport, land, highway, pier, \* \* \* sewer, drain, main, conduit, machinery or mechanical, electrical or other equipment for said municipality shall contain or provide that: \* \* \*." Then follow seven sub-sections, lettered from (a) to (g) which contain the required provisions, which we quote or summarize below. They are that:

(a) Eight hours shall constitute a day's work for all laborers, workmen or mechanics, except in time of war or other emergency, and that (subject to like exceptions) no contractor or sub-contractor shall require or permit any such employees to work more than eight hours a day;

(b) If any such employee does work over eight hours a day in an emergency, he "shall be paid not less than the minimum wage rate fixed in the contract for working overtime" for each hour in excess of eight, or fraction thereof.

"(c) A schedule of minimum hourly wage rates, including those for working on Sundays, legal holidays or more than eight \* \* \* hours in any one calendar day, established by the Board of Estimates as hereinafter provided, to be paid to all classes of laborers, workmen or mechanics needed on the project to execute the contract;"

"(d) The contractor and any and all of his sub-contractors shall pay not less than the minimum hourly wage rates fixed by the schedule of such wage rates forming a part of the contract \* \* \* to all laborers, workmen and mechanics directly employed by him or them \* \* \* on the project;"

(e) The contractor and sub-contractors shall keep records giving the names and occupations of laborers, workmen and mechanics employed by them on the project, and of the hourly wages paid to

them; and such records shall be open to inspection by the City;

(f) The contractor and sub-contractors shall keep posted a complete schedule of all minimum hourly wage rates paid and to be paid on the project;

(g) If the contractor or any of his sub-contractors fails to comply with any of the provisions of sub-sections (a) (b) or (d), the contractor shall forfeit to the City $10.00 a day for each employee affected by such failure; and in addition, if the contractor or any of his sub-contractors fails to comply with any of the provisions of sub-sections (e) or (f), the contractor shall forfeit to the City $10.00 a day for each day that he or any of his sub-contractors shall so fail.

Section 2 of the Ordinance provides "That the Board of Estimates * * * is * * * authorized and empowered to adopt, establish, repeal, modify, change or amend, from time to time, schedules of minimum hourly wage rates to be paid to any and all classes of laborers, workmen or mechanics directly employed by any contractor or any sub-contractor on any of the various types of work or projects mentioned in, or comtemplated by, Section 1 of this ordinance; provided, however, that such schedules of minimum hourly wage rates, including wage rates for working on Sundays, legal holidays or overtime, shall not be less in amount than the general prevailing hourly wage rates being paid to laborers, workmen and mechanics on the basis of eight (8) hours constituting a day's work or for working on Sundays, legal holidays or overtime, as the case may be, for doing work of a similar character in the locality in which the project is located; and such general prevailing hourly wage rates shall be determined by the Board of Estimates whose decision in the matter shall be final."

Section 3 of the Ordinance authorizes the Board to make any and all rules and regulations and to take any other action "necessary or proper to put into operation and effect any and all of the provisions of this ordinance."

Section 4 provides that in case of conflict between the

Ordinance, or any rule, regulation or wage scale established thereunder and any provision, minimum wage rate or rule contained in, or contemplated by, any agreement between the City and the Federal Government, or any agency thereof, then the provision, minimum wage rate or rule contained in such agreement shall control.

Section 5 exempts existing contracts and others entered into pursuant to invitations for bids issued prior to October 1, 1945.

Section 6 repeals any and all inconsistent prior laws and ordinances to the extent of any inconsistency, and Section 7 contains separability provisions in comprehensive form. Section 8 bars the revival of any law previously repealed by any repeal contained in this Ordinance, and contains a saving clause as to rights accrued and liabilities (including penalties and punishments) incurred under any law repealed by this Ordinance.

## THE TITLE OF THE ORDINANCE

One of the appellants' grounds of attack upon the Ordinance is the alleged deficiency of its title. This is based upon the fact that the title does not specifically refer to the exception contained in Section 4. The same rules which govern the validity of the title of Acts of the General Assembly also govern the validity of the titles of Baltimore City ordinances. See Constitution of Maryland, Article 3, Sec. 29 and Baltimore City Charter (1946); Everstine, *Legislative Titles,* 9 Md. Law Rev. 197, at 244, and cases cited in note 137. The appellants rely upon *Nutwell v. Anne Arundel Co.,* 110 Md. 667, 73 A. 710, in which the title of an act indicated that all owners of vehicles using the public streets or roads were to be required to have licenses therefor, but the body of the Act exempted numerous kinds of vehicles and granted an exemption from other taxes on vehicles for which a license was required. The title was held misleading and invalid because of each of these departures of the body of the Act from what the title indicated. It is interesting to note that the Act also purported to grant

reciprocal exemptions to holders of County licenses and to the holders of similar licenses issued by the City of Annapolis. This exception is not mentioned in the opinion and therefore would not seem to have been even suggested as a ground of invalidity of the title. We find nothing misleading in the title of the Ordinance here under attack. Certainly the mere existence of an exception would not make it so. See *Mt. Vernon Co. v. Frankfort Co.,* 111 Md. 561, 75 A. 105, in which the title of an Act amending a provision of the Code of Public General Laws made no reference to the fact that the body of the Act exempted certain counties from its operation. In the present case the first few lines of the title show that the Ordinance is not intended to be all-inclusive by describing it as "An ordinance providing that *certain contracts* of the Mayor and City Council of Baltimore shall contain provisions relative to the number of hours constituting a day's work for, and the minimum rate of wages to be paid to, *certain* employees of contractors and sub-contractors * * *." (Italics ours.) "Certain", though not infrequently of rather indefinite significance, surely does not mean "all".

Even if there were any apparent defect in the title of the Ordinance, we note that since its enactment the Ordinance has been included in the Baltimore City Code of 1950 as Sections 14-21, inclusive, of Article 1. Any deficiency in the title would thereby have been cured. *Jones v. State,* 207 Md. 481, 115 A. 2d 273, and cases therein cited.

We find the appellants' contention that the Ordinance is invalid because of a defective title is not tenable.

## DELEGATION OF POWER

The appellants assert that there is an unlawful delegation of power to the Board of Estimates to fix minimum wages and they attack the validity of the wage scales adopted by the Board. In support of their attack on the delegation of power, they assert (a) that Chapter 653 and the Ordinance attempt to delegate legislative power to an administrative board in contravention of Article XI-A of the Maryland Constitution, and (b) that, even if that attack fails, the attempted

delegation of power involves a denial of due process and of the equal protection of the laws because sufficient guides and standards are not established and because the statute and ordinance are too vague and indefinite.

Reading Chapter 653 and the Prevailing Wage Ordinance together, we see that the Board of Estimates is given considerable administrative power, but we think that there is no actual delegation of legislative power. The establishment of minimum wage rates on City contracts has been authorized by the State Legislature and the determination to establish such rates has been made by the City's legislative body, the City Council. The Board of Estimates has been directed by the Ordinance to do two things: (1) to incorporate certain terms in City contracts, among which terms are those relating to hours and minimum wages; and (2) to determine the general prevailing hourly wage rates in the locality in which any project is located for work of a similar character. The minimum wage scale included in the contract must not be less than that found by the Board to be the prevailing wage scale in the locality. The Board has made its findings and has established minimum wage scales at what it finds to be the general prevailing hourly wage rates. It has not gone above the rates so found. As was said in *Weer v. Page,* 155 Md. 86, at p. 92, 141 A. 518, at p. 520, "It is competent for the State to impose upon administrative officers the duty of ascertaining specific facts upon which a prescribed application of the police power is made to depend." A number of cases are cited in support of this statement, among them *Tighe v. Osborne,* 150 Md. 452, 133 A. 465, in which the Court said: "* * * we have turned more and more to the plan of providing in our laws and ordinances general rules and standards, and leaving to administrative boards and agencies the task of acquiring information, working out the details, and applying these rules and standards to specific cases. This is not considered a delegation of legislative authority, though it probably does represent an expansion of administrative power." For more recent applications of like views, see such cases as *Petrushansky v. State,* 182 Md. 164, 32 A. 2d

696; *Givner v. Commissioner of Health,* 207 Md. 184, 113 A. 2d 899, and cases therein cited.

Since the Board of Estimates is not shown to have prescribed minimum wages in excess of those which it found to be the prevailing wages, we are not confronted by any problem as to whether it might have adopted a higher scale and, if so, how much higher.

On the facts of this case we find no delegation of legislative power to the Board of Estimates and no exercise of power by the Board in excess of that which Chapter 653 and the Ordinance purport to authorize. The appropriateness of administrative action to adapt the City's scale to changing conditions could hardly have been better stated than by Mr. Holland, one of the appellants' witnesses and formerly the Chief Engineer of the City, who testified on cross-examination that wages "change almost every week."

## ALLEGED LACK OF STANDARDS AND INDEFINITENESS

The appellants' attack based upon the alleged lack of standards and guides by which the Board of Estimates is to be governed is, we think, untenable.

In *Ruark v. Engineers' Union,* 157 Md. 576, 146 A. 797, the validity of Chapter 94 of the Acts of 1910 was under attack. That statute, a public local law applicable to Baltimore City, was similar to the Ordinance with which we are now concerned. Its provisions as to eight hours constituting a day's work on City contracts were almost identical with those of the Ordinance. A proviso with regard to the amount of wages was that they should not be less than the "current rate of per diem wages in the locality where the work is performed * * * in the execution of any contract or contracts in any public work within the City of Baltimore."

We see no substantial difference between the provisions as to "locality" in the statute involved in the *Ruark Case* and those in the Ordinance now before us. It is true, as the appellants say, that the Ordinance would apply to work on one of the City reservoirs or at the municipal airport, which

are outside of the corporate limits of Baltimore City. All of these are within approximately twenty miles of the City Hall, and some are much closer.

We think that it would be an undue refinement to insist that "locality" must be so narrowly construed as to cover only the area within the City limits and to exclude nearby City-owned property. There is no showing that conditions are so different at one of the "remote" reservoirs as to cause a different wage scale to prevail there. If there were, that might call for the application of the saving clauses of both the statute and the Ordinance; but no such question is before us and there is no occasion to decide it.

In the *Ruark Case,* the Court held that the word "'locality' defines a region, with the public undertaking as an axis or focal point, throughout which region the daily wage of the particular class to which the worker belongs is uniform." The Court also held the term to be sufficiently definite.

We also think that there is little real difference between the terms "current rate of per diem wages" and "general prevailing hourly wage rates". In the *Ruark Case,* the Court said that "the term 'current rate' means the charge for or valuation of the daily labor in question according to a scale or standard generally received or established by common consent or estimation. Wages, particularly those of such numerous classes as laborers, workmen, and mechanics, tend to uniformity and stability and so to an average or ordinary rate, which varies somewhat from place to place, and which Adam Smith speaks of as the 'natural rates of wages' at the time and place in which they commonly prevail." It is true that in recent years wages have not been noted for stability (See Mr. Holland's testimony above referred to.), but it is also true that any contractor bidding on a job must have at least a fairly good idea of what labor costs he must meet. The City's prevailing wage scales tend towards certainty in one respect—in that they tell a contractor what his minimum rates of compensation must be.

Prevailing wage requirements in public contracts are by no means peculiar to the City of Baltimore. See, for ex-

ample, the Walsh-Healey Act, U.S.C.A., Title 41, Secs. 35-45, and the Bacon-Davis Act, U.S.C.A., Title 40, Sec. 276a, *et seq.* The duties of the Secretary of Labor in determining prevailing wages under those Acts are somewhat similar to those of the Board of Estimates under the Ordinance here involved with regard to determining prevailing wages. There are also prevailing wage laws in other states.

The validity of such laws has been upheld since *Atkin v. Kansas,* 191 U.S. 207. The appellants rely heavily upon *Connally v. General Const. Co.,* 269 U.S. 385, in which a prevailing wage statute of Oklahoma which carried criminal penalties for its violation was held invalid on the ground that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." That case was also pressed upon this Court in the *Ruark Case,* but this Court did not then consider it controlling and noted that convictions under the criminal provisions of Chapter 94 of the Maryland Act of 1910 had been upheld by this Court in *Sweeten v. State* and in *Elkan v. State,* 122 Md. 634 and 642, respectively, which had both been affirmed by the Supreme Court in a memorandum opinion *sub nom. Elkan v. Maryland,* 239 U.S. 634. We should have to overrule the *Ruark Case* on this point in order to sustain the appellants' contentions. It is not necessary, however, to go into that question, since neither Chapter 653 nor the Ordinance undertakes to impose any criminal liability; and, in addition, the contractor is faced with no uncertain standard, because the wage scale to which he must conform is made a part of his contract.

Cases in other states sustain the validity of prevailing wage laws similar to the Ordinance. *Campbell v. City of New York,* 244 N. Y. 317, 155 N. E. 628; *Bradley v. Casey,* 415 Ill. 576, 114 N. E. 2d 681; *Metropolitan Water Dist. v. Whitsett,* 215 Cal. 400, 10 P. 2d 751. The case last cited involved a statute indistinguishable in substance from the Ordinance here involved, and cited the *Ruark Case* in reaching its conclusion.

Before leaving this branch of the case we may point out that Chapter 653 of the Acts of 1945 filled the gap which led to the decision in *Baltimore v. Employers' Ass'n,* 162 Md. 124, 159 A. 267, in which it was held that the City authorities were not authorized to establish a scale of current *per diem* wages, notwithstanding that contractors and subcontractors on City contracts were required by Chapter 94 of the Acts of 1910 to pay "not less than the current rate of *per diem* wages" in the locality where the work is performed.

## ADOPTION OF PREVAILING WAGE SCALES

The appellants' next assault is directed against the scales of prevailing wages adopted by the Board of Estimates. There have been several such scales since the passage of the Ordinance in 1945. The first was adopted in September, 1945, and did not break down City contracts into different classifications. Ninety-six separate prevailing wage scales were included. At that time wages were still subject to Federal wartime controls. About six months later the first classification based on different types of work was adopted. Mr. Paul L. Holland became the Chief Engineer of Baltimore in January, 1948, and continued in that office until October, 1954. As Chief Engineer he was a member of the Board of Estimates throughout that period. In August, 1948, he submitted a report and recommendations to the Board of Estimates with regard to wage scales. He pointed out wide variations in wages in certain trades and the difficulty or impossibility, in his opinion, of determining prevailing wages in some instances. He recommended the establishment of two classifications of work, the first, "Building Construction" and the second "Other Than Building Construction", with fifteen categories of workmen in the first and three in the second. In reporting his recommendations for these classifications and the minimum wage rates set forth, he stated, "I believe that the rates recommended above do, in fact, fairly represent the generally prevailing rates in Baltimore City and are fair to the classes of laborers concerned and to the taxpayers of the City."

Not long afterwards it developed that the minimum wage rates were seriously out of line with the wage scales prevailing in shipyards and were in fact substantially higher, though the shipyard rates were practically the union scale in all yards in Baltimore. As a result, a third classification was set up by the Board of Estimates on February 23, 1949, known as "Shipyard—Marine Work (Building or Repair)".

A year later the engineering firm of Whitman, Requardt and Associates was employed to advise and assist the Board in the determination of general prevailing hourly wage rates. Mr. Requardt of that firm presented a report to the Board, dated June 29, 1950, in which he recommended the establishment of three classifications: for (1) new building construction (including major remodeling of buildings); (2) heavy structures and foundations, grading and paving, utility structures and minor building repair and maintenance; and (3) shipbuilding and repair. He later supplemented or clarified these recommendations. In making his report and recommendations Mr. Requardt stated his understanding of the word "prevailing" as meaning "prevalent, most general, common, predominant or current" and as not meaning either an average or a median. This, we think, was in accord with the *Ruark Case,* above cited. Mr. Requardt very frankly admitted the difficulty of his task, but his firm has had some forty years' experience in construction work and has been engaged in many large projects. He drew upon the experience of the firm and he sent out questionnaires to numerous contractors, many of whom responded, and he used their replies and other information available to him. He did not make use of either Federal or State wage scales, and the figures which he recommended differed materially from the scale of wages paid by the City to its own employees.

On November 8th, 1950, the Board of Estimates adopted Mr. Requardt's recommendations. Mr. Frank Clark Ellis, President of the Baltimore Building and Construction Trade Council protested against some of the rates. On July 25, 1951, according to the minutes of the Board, on recommendation of the City Solicitor and the Chief Engineer made

after considering Mr. Ellis' request and after study and consideration of prevailing wages paid, the Board of Estimates adopted a new wage scale, broken down into three classifications. In his oral testimony in this case Mr. Holland denies having made this recommendation.

One of the principal changes made by the new classification was the transfer of contracts for dams, bridges, docks, filtration plants, sewage treatment works, pumping stations and similar works and buildings and of other types of heavy construction, the major value of which is in the substructure, from classification 2 to classification 1. The revised rates were made retroactive to July 18, 1951, thereby, the appellants say, making the higher rates applicable to the Liberty Dam project which cost over $4,476,000.

Further changes were made in the wage scale in February, 1953, largely on the basis of and with one exception in conformity with, a further report submitted by Mr. Requardt to bring data on prevailing wages up to date. Some further changes were made in July, 1953, in wage rates in classification 2 in accordance with a report presented to the Board of Estimates by Mr. North, of Whitman, Requardt and Associates.

Extensive public hearings were held by the Board in connection with the 1951 and 1953 changes in wage scales.

The appellants complain that there are three different "prevailing wages" and not any one prevailing wage is a result of there being three classifications dealing with the same general type of work. The City was not unaware of this problem, as a letter from its then labor consultant, the Honorable Simon E. Sobeloff, to an official of the U. S. Department of Labor shows. The appellants have submitted a vast amount of detailed data showing comparisons of wages. They also complain that the wage scale under classification 1 is substantially the union scale, that the wage scale under classification 2 is substantially an open shop scale and that the scale under classification 3 is substantially another union scale.

These contentions are not without force, but we do not think that the evidence is such as to sustain the charge that

the Board acted in an arbitrary and unreasonable manner in establishing the three different classifications and the wage scales thereunder. It may be noted that classification 3 came into existence because the City found that "prevailing" wages existing in land construction work were very materially different from the wages actually prevailing in shipyard work.

It is too well settled to call for discussion that reasonable classifications do not contravene constitutional limitations, and the text of the Ordinance contemplates and authorizes classification. Chapter 653, it will be recalled, allows extensive powers to be conferred upon the Board of Estimates by ordinance; and Section 2 of the Ordinance empowers the Board to "adopt, * * * modify * * * or amend * * * schedules of minimum hourly wage rates to be paid to *any and all classes of laborers, workmen or mechanics* directly employed by any contractor or * * * subcontractor *on any of the various types of work or projects* mentioned in, or contemplated by, Section 1." (Italics supplied.) The proviso contained in this Section states that the "schedules of minimum hourly wage rates * * * shall not be less * * * than the general prevailing hourly wage rates being paid to laborers, workmen and mechanics for doing *work of a similar character* * * *." (Italics ours.) The language of the Ordinance is broad enough to support the types of classifications and sub-classifications adopted by the Board. We think that there are substantial differences between the three types of work. It is also clear that most of the classifications here under attack were made in accordance with the recommendations of a disinterested firm of engineers of great experience in construction work and sufficiently versed in wage costs to prepare a cost index giving the wage costs of various types of construction which appears annually in the construction costs issue of the Engineering News Record. The qualifications of the firm were attested to by Mr. Holland, who appears in the somewhat anomalous position of an original defendant who participated in—or at least is not recorded as dissenting from—many of the actions of the Board of Estimates now complained of, and of a star witness for the appellants.

We do not find from the record before us that the ac-

tion of the Board in establishing the three separate classifi-
cations of work and of wage scales thereunder was arbitrary
or capricious.  Therefore, we should not be warranted in
striking them down, *in toto,* as the appellants ask us to do.

## BID WITHOUT AGREEING TO WAGE SCALE

The final claim is that of the appellant, The Roland Elec-
trical Company (Roland), based upon the City's refusal to
enter into or go through with a contract for the wiring of
a school.

In brief, the essential facts with regard to this claim are
that the City asked for bids on the project by a form of
invitation which referred to Ordinance No. 225 and con-
tained a clause stating that "The following is a schedule of
minimum hourly wage rates, * * * to be paid to all classes
of laborers, workmen or mechanics needed on the project to
execute this contract: * * *".  Then followed the three classi-
fications and the wage rates applicable under each.  Roland
stated in its proposal sheet that it did not pay "what is known
as prevailing wages".  There is some controversy as to
whether the wage rates specified under classification 1 were
(as the City contends) or were not (as Roland Electrical
Company contends) properly applicable to this project un-
der the Board of Estimates' resolution with regard to what
classification 1 covered.  We think that this is immaterial.
Bids were asked for on the basis of at least one or the other
of classifications 1 and 2 and the respective wage scales there-
under, but Roland put in a bid in which it refused to be bound
by any prevailing wage scale.  The City, on opening the bids,
failed to notice this exception and notified Roland of the accept-
ance of its bid.  Soon afterwards the City learned of its error
and refused to sign a contract to which Roland attached a clause
denying the applicability of the wage scale.  Whether classifica-
tion 1 or classification 2 was the proper one to apply to this
work, the reservation put into its bid by Roland would seem as
applicable to one scale as to the other.  Each was included in
the request for bids.  The fact that Roland's own wage scale for
electricians happened to accord with the City's scale under

414

classification 2 was something of which Roland was doubtless aware, but it seems quite inconsistent for Roland to urge, in effect, in one breath that it is not bound by any City wage scale at all and in the next that since it complies with the wage scale contained in one of the City classifications, there is a binding contract based on that scale. If Roland had written on its bid "We consider classification 2 applicable to wages to be paid on this job" instead of saying "We do not pay what is known as the Prevailing Rate of Wages," we might have quite a different situation. Here the Ordinance required that a contract for a job such as this one contain an agreement on the part of the contractor to pay not less than the minimum hourly wage rate fixed by the Board of Estimates, and Roland was well aware of that requirement. That wage rate, under Section 2 of the Ordinance, was to be not less than the general hourly wage rate prevailing in the locality, and Roland was well aware of that. It is hardly to be supposed that the City would be bound by a contract directly contra to the requirements of an ordinance under which it purported to act. See *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A. 2d 128, and cases therein cited. Consequently, even if Roland is correct in its claim based upon *American Lighting Co. v. McCuen,* 92 Md. 703, 48 A. 352, that an agreement resulted (which we do not think it necessary to decide), the City would not be bound thereby. See also *Hanna v. Board of Education of Wicomico County,* 200 Md. 49, 87 A. 2d 846.

In accordance with the views above expressed, the decrees appealed from will be affirmed.

*Decrees affirmed, with costs.*